## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re:<br><br>BOTW HOLDINGS, LLC<br><br>    Debtor | Case No. 24-20138<br>Chapter 11 (Subchapter V) |
| In re:<br><br>HUSKEMAW OPTICS, LLC<br><br>    Debtor | Case No. 24-20141<br>Chapter 11 (Subchapter V) |
| In re:<br><br>BEST OF THE WEST<br>PRODUCTIONS, LLC<br><br>    Debtor | Case No. 24-20142<br>Chapter 11 (Subchapter V)<br><br>**Jointly Administered Under<br>Case No. 24-20138** |
| BOTW HOLDINGS, LLC,<br>HUSKEMAW OPTICS, LLC, and<br>BEST OF THE WEST PRODUCTIONS, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>JOHN A. McCALL, Jr. and<br>STEALTH VISION, LLC,<br><br>    Defendants. | Adversary Proceeding No. 25-02020 |

FILED
UNITED STATES BANKRUPTCY COURT
DISTRICT OF WYOMING
3:54 pm, 11/13/25
HJ Esterholdt
Clerk of Court

### ORDER GRANTING PRELIMINARY INJUNCTION

This matter is before the court on the Verified Motion for a Preliminary Injunction filed by BOTW Holdings, LLC (Holdings), Huskemaw Optics, LLC (Huskemaw), and Best of the West Productions, LLC (Productions), Debtors herein (ECF No. 4), the Objection filed by John A. McCall, Jr. and Stealth Vision, LLC (ECF Nos. 11), and the Supplemental Objection filed on the morning of the hearing (ECF No. 24). On October 15, 2025, the court issued a Temporary Restraining Order.[1] On October 27, 2025, the court conducted an evidentiary hearing on the Motion. At the conclusion of that hearing, the court ordered the Temporary Restraining Order continued in effect to and including November 12, 2025, pending this decision. The court has

---

[1]   ECF No. 15.

considered the evidence presented, the parties' requests for judicial notice, and the court's record[2] and grants the Motion as follows:

**Introduction**

Debtors filed their Chapter 11 cases under Subchapter V in late April 2024. A hearing on plan confirmation is scheduled for two days in mid-December 2025.

Debtors, along with their non-debtor affiliates, Best of the West Arms, LLC (Arms) and Best of the West Ammo, LLC (Ammo), manufacture and market high-end rifle scopes, optics, shooting systems and related products. The company is based in Cody, Wyoming. Each of the BOTW entities is a separate Wyoming limited liability company, with Holdings owning 100% of Huskemaw, Productions, Arms, and Ammo.[3]

Chase Myers is the Chief Operating Officer and Manager of the BOTW entities. He is the only officer and manages the businesses' day-to-day operations. Mr. Myers, along with Jeff Edwards, own Stryk Group USA, LLC, with Mr. Edwards as the majority owner of that entity. Stryk Group USA, LLC is the sole owner of Stryk Group Holdings, LLC, which in turn is the majority owner of Debtor BOTW Holdings.

John A. McCall, Jr. filed claims in each of Debtors' bankruptcy cases. He is an optometrist with an active practice and surgery center in Crockett, Texas, a small community of about 7,000 people. Dr. McCall founded a company engaged in selling high-end patented weapon optics, Stealth Vision, LLC—a direct competitor of Huskemaw. Dr. McCall has a federal firearms license[4] and is an experienced hunter.

Debtors' cases have a tortured history entailing litigation with Dr. McCall at nearly every turn. The court fully incorporates herein its findings and conclusions issued after a multi-day hearing on Dr. McCall's motion to convert Debtors' cases to Chapter 7.[5]

**Pre-Petition Events**

As the court previously found, in early 2016, Dr. McCall met Joe Cunningham and Jack Peterson, former President and Chief Executive Officer of Productions and Huskemaw, who was seeking investors for the business. In exchange for his $1.5 million investment, Dr. McCall acquired

---

[2]   Dr. McCall requested additional post-hearing briefing. Debtors objected. The court found additional briefing would be create unnecessary delay and expense. Despite this, Dr. McCall filed a post-hearing brief (ECF No. 30), which the court is not considering.

[3]   Long Range Store, LLC is also a wholly owned subsidiary of Holdings but has no production or sales activity.

[4]   It is unclear whether the license belongs to Dr. McCall personally or to his business Stealth Vision.

[5]   *See* Case No. 24-20138, ECF No. 448 (Ex. 17), Order Denying Creditor John A. McCall, Jr.'s Amended Motion to Convert Cases to Chapter 7 or for Removal of the Debtor in Possession (Order Denying Motion to Convert).

a 20% ownership interest in Productions and Huskemaw, and he became co-chairman of the board of directors; Dr. McCall was not merely a passive investor.

After his initial investment, Dr. McCall helped Productions obtain a $500,000 revolving line of credit from Wells Fargo Bank N.A., secured by its inventory and other assets. He pledged $1 million of his own money as additional collateral for the Wells Fargo line of credit, which contained a covenant for the company to leave $500,000 in the credit line for a period of 30 days. Despite Dr. McCall's admonishments, Mr. Peterson did not satisfy that covenant. About two months prior to the maturity date, after Dr. McCall had loaned another $500,000 to the company, Mr. Peterson pulled all the funds within three days to pay a manufacturer (among other things), so the covenant was not met. This became a contentious issue, as the line of credit was about to mature.

As the company never made payments on the line of credit, interest and penalties racked up. Ultimately, Dr. McCall negotiated with Wells Fargo on his own and acquired the line of credit for about $395,000, to save his own credit. Later, he started reviewing the company's books and believed them incorrect as they reflected a loss, but by Dr. McCall's estimations, the business should have made close to a million in profit. According to Dr. McCall, insiders were pulling money out of the company instead of paying him as an investor. Toward the end of 2017, Dr. McCall consulted counsel.

In February 2018, Dr. McCall sued Productions, Huskemaw, and Peterson in Park County, Wyoming. He brought a multitude of claims, including violations of the company's operating agreement, collusion against him, non-payment of the Wells Fargo debt, and conversion of his equity interest. The litigation culminated in a 24-day jury trial in October of 2023.

In 2020, as the litigation progressed, the company underwent a corporate restructuring. Joseph and Christine Michaletz purchased a controlling interest in the company, as Dr. McCall found out through discovery. The Michaletzes became the managers of Productions, Huskemaw, and Holdings—having formed Holdings (and Arms and Ammo) through their trust entities. Peterson reserved a royalty interest as part of this transaction. Dr. McCall received no payment for his interest. Debtors' current managers were not involved in these transactions.

Holdings was added as a party to the state court litigation. Over the course of the litigation, the trial court dismissed several of Dr. McCall's claims and did not dissolve BOTW. In late October 2023, a jury awarded Dr. McCall $3,555,201 in damages.[6] The jury found in favor of Dr. McCall and against Productions and Huskemaw:

---

[6]   This amount does not include prior amounts awarded by the trial court in favor of Dr. McCall and against Huskemaw and Productions of $56,850 in attorneys' fees and costs, and the principal sum of $396,095.

as to Plaintiff's claims for Breach of Contract related to a December 31, 2015
Limited Liability Membership Interest Sale Agreement, Breach of an Operating
Agreement, Declaratory Judgment on the Wells Fargo Line of Credit, Breach Of
The Implied Covenant Of Good Faith and Fair Dealing, Oppression, and
Conversion. The Jury awarded no damages ($0) as to Plaintiff's claims for Breach of
Contract of the December 31, 2015 Limited Liability Membership Interest Sale
Agreement and Breach of the Implied Covenant of Good Faith and Fair Dealing.
The Court awarded no damages or other relief for Plaintiff's claim of Oppression.
The Jury awarded damages to Plaintiff in the sum of $1,784,640 for Plaintiff's claim
of Conversion. The Jury awarded damages to Plaintiff in the sum of $1,695,56l for
the Declaratory Judgment on the Wells Fargo Line of Credit, which is in addition to
the principal sum of $396,095 the Court ordered is owed to Plaintiff. . . .[7]

In its Amended Judgment, the trial court reduced the jury award to $2,441,523.57 by reducing the

damages on Dr. McCall's conversion claim from $1,784,640 to $293,017.57. As part of the

Judgment, Holdings agreed to assume liability as to the judgments against Productions and

Huskemaw.[8]

While the litigation was ongoing in state court, Dr. McCall met Jeff Edwards at a trade show

in January of 2023, which led to a consulting relationship between Dr. McCall's company (Stealth

Vision) and Stryk Group Holdings, LLC (hereafter, Stryk Group), an entity owned indirectly by Jeff

Edwards and Chase Myers. In April or May of 2023, Dr. McCall invited Jeff Edwards to Crockett,

Texas and retained Stryk Group as a marketing consultant for Stealth Vision pursuant to a three-

month memorandum of understanding. Mr. Edwards, Mr. Myers, and Chase Wheeler met with Dr.

McCall in Crockett, and according to Dr. McCall, "they all left with a lot of marketing equipment,"

including scopes and other optical items. Stryk Group provided four months of marketing and

consulting services to Stealth Vision. According to Dr. McCall, the engagement resulted in the sale

of only one optic, and he subsequently terminated the relationship.[9]

At their meeting in Crockett, Dr. McCall agreed to loan a rifle to Jeff Edwards, as Mr.

Edwards was going on a sheep hunt in July and wanted to practice with the rifle, shoot promotional

video, and take photographs in his professional capacity as a marketing and distributing manager.

Dr. McCall did not give the rifle to Mr. Edwards at the meeting; he sent it to him afterward.[10]

Despite Dr. McCall's repeated requests over the course of about a year, Mr. Edwards did not

return the rifle. Dr. McCall believed Mr. Edwards gave it to a hunting guide as a tip.

Although they ended their business relationship, Dr. McCall believed he could still work

with Mr. Edwards in the future, until he learned in late 2023, after the trial, that Stryk Group had

---

[7]   *See* Order Denying Motion to Convert, p. 3 (Ex. 17).
[8]   *See* Order Denying Motion to Convert, p. 4 (Ex. 17).
[9]   *See* Order Denying Motion to Convert, p. 4 (Ex. 17).
[10]  *Id.*

entered into a similar consulting agreement with the Michaletzes and was working for the BOTW entities during his lawsuit against them.[11] This discovery marked the breakdown of the relationship between Dr. McCall and Mr. Edwards, which became antagonistic.[12]

On or around March 9, 2024, Stryk Group acquired BOTW Holdings for $1 plus the assumption of existing debts, including that owed to Dr. McCall.[13] The Michaletzes retained Restricted Units in the Company under the Membership Interest Purchase Agreement, which also includes an indemnification for the benefit of the Michaletzes.[14] Stryk Group agreed to indemnify the Michaletzes under the Agreement against losses as defined therein, and Mr. Myers and Mr. Edwards personally guaranteed the obligations of Stryk Group under the Agreement as described therein. Mr. Myers and Mr. Edwards manage both BOTW Holdings and Stryk Group.

The state court issued a stay of execution of the Amended Judgment but required the defendants to post an appeal bond, which they did not do.[15] In late April 2024, about six weeks after Stryk Group acquired BOTW Holdings, Debtors filed their Chapter 11 petitions.

**Debtors' Bankruptcy Filings**

Holdings filed its voluntary petition in this court under Chapter 11, Subchapter V on April 19, 2024. Huskemaw filed its petition on April 21, 2024. Productions filed its petition on April 22, 2024. Debtors' cases are being jointly administered for procedural purposes under Fed. R. Bankr. P. 1015(b), pursuant to Orders of the court entered on April 24, 2024.[16] Joli A. Lofstedt is the duly appointed Subchapter V Trustee. Debtors are authorized to operate their business and manage their properties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.[17]

On May 14, 2024, the court approved the employment of Markus Williams Young & Hunsicker LLC (MWYH) as Debtors' counsel pursuant to Sections 327 and 328, effective April 19, 2025, the date counsel filed the Application.[18] On July 2, 2024, the court entered an Order Establishing Interim Compensation Procedures and Billing Methodology for Debtors' Counsel (Interim Compensation Procedures Order), authorizing interim compensation procedures for Debtors' counsel. Pursuant to this Order, this court retains "jurisdiction with respect to all matters relating to the interpretation or implementation of this Order."[19]

---

[11] *See* Order Denying Motion to Convert, p. 4.
[12] *See* Order Denying Motion to Convert, p. 4.
[13] Ex. F, Membership Interest Purchase Agreement. This Exhibit is an incomplete version of the Purchase Agreement as the schedule including the list of liabilities is not included.
[14] Ex. F, § 8.17.
[15] *See* Order Denying Motion to Convert, p. 5.
[16] *See* ECF No. 13, Case No. 24-20138; ECF No. 12, Case No. 24-20141; ECF No. 12, Case No. 24-20142.
[17] All references to the Bankruptcy Code, or to Sections thereof, are to 11 U.S.C. § 101 *et seq.*
[18] Case No. 24-20138, ECF No. 51.
[19] Case No. 24-20138, ECF No. 92 (Ex. 19).

Dr. McCall has participated in these Chapter 11 cases, through counsel, as early as May 21, 2024, the date initially scheduled for the Section 341 Meeting of Creditors. On June 21, 2024, Dr. McCall filed nearly identical proofs of claim in each of the Chapter 11 Cases (together, the McCall Claim), as follows:

| Case | Claim No. | Amount (Total / Secured) | Basis |
|------|-----------|--------------------------|-------|
| Holdings | 7-1 | $4,598,146 / $2,751,656 | State court judgment |
| Huskemaw | 3-1 | $4,598,146 / $2,751,656 | State court judgment |
| Productions | 3-1 | $4,598,146 / $2,751,656 | State court judgment |

Dr. McCall voluntarily filed the McCall Claim, submitting to the personal jurisdiction of this court. Each Debtor filed a plan of reorganization on July 18, 2024.[20] The Holdings and Huskemaw plans did not account for the McCall Claim. Subsequently, upon Dr. McCall's request, on August 30, 2024, the court deemed the McCall Claim filed in the Huskemaw and Holdings cases as timely.[21]

Dr. McCall asserts a portion of his Claim in the amount of $2,751,656.00 is secured by Debtors' assets based on the Wells Fargo's lien he acquired, despite the fact Wells Fargo's lien was perfected by the filing of a UCC-1 Financing Statement as to Productions' assets only.

Prior to seeking reprieve to file late claims, Dr. McCall filed a motion for relief from stay to finalize his request for attorneys' fees and to appeal the reduced state court judgment. After the court deemed the McCall Claim in the Huskemaw and Holdings cases as timely, the parties submitted an agreed order defining the scope of the relief from stay.[22]

In its Order Denying the Motion to Convert, the court previously found Dr. McCall has not been paid any money on his judgment, nor has he been paid any return on his substantial investment.[23] Since that time, it appears Dr. McCall has been paid approximately $475,000.[24]

**Post-Petition Disputes in Bankruptcy Court**

To date, there have been a multitude of contested matters, adversary proceedings, and otherwise disputed matters raised by Dr. McCall in Debtors' Chapter 11 cases, which have either (a) been addressed by this court after notice and a hearing, or (b) remain pending before this court.

---

[20] ECF No. 100 (Holdings); ECF No. 40, Case No. 24-20141 (Huskemaw); and ECF No. 40, Case No. 24-20142 (Productions).

[21] *See* Case No. 24-20138, Order at ECF No. 145. Dr. McCall timely filed his claim in Productions' bankruptcy case.

[22] *See* Case No. 24-20138, ECF No. 203.

[23] *See* Order Denying Motion to Convert, p. 5 (Ex. 17).

[24] *See* Proof of Claim No. 4-1 filed on June 25, 2025, a contribution claim in the amount of $475,000 filed by Dale Caldwell in Productions' bankruptcy case, Case No. 24-20142.

1. *The McCall Adversary*

On July 22, 2024, Dr. McCall filed a Complaint Objecting to Debtor's Discharge under 11 U.S.C. § 1141(d) against Debtor Productions only (McCall Adversary).[25] By initiating the McCall Adversary, Dr. McCall consented to this court's jurisdiction to determine all matters presented therein and related thereto. In his Complaint, Dr. McCall admits this court has jurisdiction over the McCall Adversary, he admits the matter is a core proceeding, and he consents to entry of final orders and judgment by this court with respect to the claims and issues asserted therein.[26]

In his Complaint, Dr. McCall alleges, in part, Productions "transferred all or substantially all of its assets, worth more than $2 million, for less than fair value ($0) to Best of the West Arms, LLC, Best of the West Ammo LLC or other entities" as "part of a scheme to defraud Creditor John A. McCall, Jr. . . . with the intent to hinder, delay or defraud Creditor. . . ."[27] At a hearing held on September 25, 2024, the court ordered the McCall Adversary be held in abeyance pending the plan confirmation process.[28] The McCall Adversary remains pending before this court.

2. *The Lien Adversary*

On September 25, 2024, Debtors filed an Adversary Complaint against Dr. McCall (Lien Adversary), seeking declaratory relief regarding the extent, validity, and priority of Dr. McCall's disputed security interests in certain assets belonging to Holdings and/or Huskemaw.[29] Dr. McCall filed his answer, as well as counterclaims against Debtors and third-party claims against Arms, Ammo, and LRS on October 28, 2024.[30] Dr. McCall filed his First Amended Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint in the Lien Adversary on August 15, 2025.[31] In his Counterclaims and Third-Party Complaint, Dr. McCall admitted this court has constitutional authority to enter a final judgment regarding the validity, extent or priority of his disputed security interests.[32] He also admitted this court has jurisdiction over the counterclaims and third-party claims asserted in the Lien Adversary, and that such matters constitute a core proceeding.[33]

In the Counterclaims and Third-Party Complaint, Dr. McCall asserts claims for declaratory judgment that all assets of the BOTW entities are subject to his lien, for judicial foreclosure upon all such assets, and for a finding that the BOTW entities are alter egos of one another.

---

[25]  Adv. Proc. No. 24-02005 (Ex. 8).

[26]  *See* Adv. Proc. No. 24-02005, Complaint at ECF No. 1, ¶¶ 2-3 (Ex. 8).

[27]  *Id.*, at ¶ 9.

[28]  Adv. Proc. No. 25-02005, Minute Order at ECF No. 8.

[29]  Adv. Proc. No. 24-02010 (Ex. 12).

[30]  Adv. Proc. No. 24-02010, ECF No. 4.

[31]  Adv. Proc. No. 24-02010, ECF No. 26 (Ex. 13).

[32]  *See* Adv. Proc. No. 24-02010, Counterclaims and Third-Party Complaint at ECF No. 26, p. 3, ¶ 9 (Ex. 13).

[33]  *See Id.*, p. 16, ¶¶ 9-10.

The Lien Adversary remains pending before this court, and the court has scheduled a trial in this matter for August 3, 2026.

3. *The Derivative Claims Adversary*

On September 27, 2024, pursuant to derivative standing conferred on Dr. McCall by this court, Dr. McCall filed a Complaint on behalf of the Productions bankruptcy estate against Arms, Ammo, and Huskemaw, asserting claims for the avoidance of purported fraudulent transfers and seeking a determination the assets of Huskemaw should be treated as the assets of Productions under an alter ego theory (Derivative Claims Adversary).[34] By initiating the Derivative Claims Adversary, Dr. McCall consented to this court's jurisdiction to determine all matters presented therein and to issue final judgment in the matter.[35] In the Derivative Claims Adversary, Dr. McCall admits jurisdiction in this court is appropriate.[36]

The Derivative Claims Adversary remains pending before this court, and the court scheduled a trial in this matter for August 24, 2026.

4. *McCall's Stryk Payment Motion*

On November 11, 2024, Dr. McCall filed a Motion for an Order Compelling Debtors to Cease Payments to Stryk Group USA LLC Unless and Until Authorized by the Court (Stryk Payment Motion), in which Dr. McCall requested this court order Debtors to cease ordinary course payments made to Stryk Group for services provided.[37]

After notice and an evidentiary hearing on the Stryk Payment Motion, on April 14, 2025, this court entered its Order Regarding Creditor John A. McCall Jr.'s Motion for an Order Compelling Debtors to Cease Payments to Stryk Group USA LLC Unless and Until Authorized By the Court (Stryk Payment Order).[38] Based on the "unrefuted" evidence admitted at the evidentiary hearing, the court concluded Debtors' payments to Stryk Group were made in the ordinary course of Debtors' day-to-day operations and Stryk Group was not a "professional person" as defined under the Bankruptcy Code, and therefore, no prior authorization from the Bankruptcy Court was required as to such payments.[39] This court further found and determined:

---

[34] Adv. Proc. No. 24-02011, Complaint at ECF No. 1 (Ex. 29). Debtors withdrew their objection to Dr. McCall's motion for derivative standing to pursue such claims, which was granted on January 10, 2025. *See* Case No. 24-20138, Order at ECF No. 258.

[35] Adv. Proc. No. 25-02011, Discovery Report at ECF No. 33, p. 2.

[36] Adv. Proc. No. 25-02011, Complaint at ECF No. 1, p. 2 (Ex. 29).

[37] *See* Case No. 24-20138, ECF No. 207.

[38] *See* Case No. 24-20138, ECF No. 388 (Ex. 14).

[39] *See* Case No. 24-20138, Stryk Payment Order at ECF No. 388, pp. 8-12 (Ex. 14).

There is no evidence before the court to suggest this first Agreement was not entered into at arms-length; at the time the first Agreement was entered into, neither Stryk Group, Stryk Holdings, Jeff Edwards, or Mr. Myers had any stake in the business. . . .

Nor does the court find there was any evidence presented that Debtors are simply "shoveling $50,000 out the door" every month without receiving the services contracted for; to the contrary, the evidence was various individuals actually perform the services identified in the Agreement, and even if they were to cease providing such services, the business would need to replace them to continue operating. Again, the evidence presented to the court was that all of the services being provided under the Agreement are necessary, daily tasks required to be performed to keep any business within the firearms industry running, and the amounts being charged to do so under the Agreement are reasonable.[40]

Dr. McCall appealed the Stryk Payment Order (Bankruptcy Appeal), and the United States District Court for the District of Wyoming affirmed the Stryk Payment Order on September 26, 2025.[41] On October 8, 2025, Dr. McCall filed another appeal, this time of the Affirming Order and related judgment, to the United States Court of Appeals for the Tenth Circuit.[42]

5. *McCall's Motion to Convert*

On February 21, 2025, Dr. McCall filed a Motion to Convert Cases to Chapter 7 or, in the Alternative, to Remove the Debtors from Being Debtors in Possession and Notice of Time to Object.[43] Because of a procedural error with his initial motion, on March 20, 2025, Dr. McCall filed an Amended Motion to Convert Cases to Chapter 7 or, in the Alternative, to Remove the Debtors from Being Debtors in Possession and Notice of Time to Object (Motion to Convert).[44] Generally, Dr. McCall requested the court convert Debtors' Chapter 11 cases to cases under Chapter 7 or, alternatively, remove Debtors as debtors-in-possession. Dr. McCall alleged substantial or continuing loss to or diminution of the bankruptcy estates and the absence of a reasonable likelihood of rehabilitation, irreconcilable conflicts of interest, and gross mismanagement.

Debtors opposed the Motion to Convert, and the court held a multi-day evidentiary hearing. On June 5, 2025, this court entered the Order Denying Motion to Convert,[45] finding Dr. McCall has a well-documented adversarial relationship with the BOTW entities and Jeff Edwards, and that his "pattern of scorched earth litigation tactics extends far beyond the scope of good faith debt collection

---

[40] *Id.*, pp. 11-12.
[41] *See* ECF No. 15, District Court Case No. 25-00108 KHR; Case No. 24-20138, ECF No. 489 (Ex. 15), copy of Order Affirming the Bankruptcy Court's Order Regarding Creditor John A. McCall, Jr.'s Motion for an Order Compelling Debtors to Cease Payments to Stryk Group USA LLC Unless and Until Authorized By the Court (Affirming Order).
[42] Case No. 24-20138, Notice of Appeal at ECF No. 514 (Ex. 16).
[43] Case No. 24-20138, ECF No. 304.
[44] Case No. 24-20138, ECF No. 338.
[45] Case No. 24-20138, Order Denying Motion to Convert at ECF No. 448 (Ex. 17).

– his actions reflect a broader strategy not merely to recover on a debt, but to destroy [the BOTW Entities], harass its principals, and chill any prospect of reorganization."[46]

    This court rejected each of the alleged grounds for conversion of the Chapter 11 cases asserted by Dr. McCall. The court expressly rejected Dr. McCall's assertion Debtors were liquidating inventory to the point there existed a diminution of the estate beyond the point at which reorganization remains realistic, and noted Debtors' cash had increased.[47] The court found Debtors' management have a plan for the BOTW Entities' go-forward operations.[48] The court further found that, while Dr. McCall had alleged Debtors' principals had violated the Gun Control Act of 1968, he omitted an exception to such violation in an attempt "designed to fan the flames" and found "there is no gross mismanagement of these Debtors" to support converting the Chapter 11 Cases.[49] The court found Debtors' efforts have been "consistent with Subchapter V's purpose – to provide a streamlined path for small businesses to reorganize," despite increases to legal fees which this court found "are largely attributable to relentless litigation [by McCall]. . . ."[50] The court further disagreed with Dr. McCall's assertion payments to Spotted Bear Marketing created a conflict of interest, finding that those "payments were made pursuant to a disclosed, arms-length Agreement entered into prepetition under prior management."[51]

    Dr. McCall filed a Motion to Amend Order and for Related Relief Pursuant to Federal Rule of Bankruptcy Procedure 9023 on June 19, 2025, which was subsequently amended on June 24, 2025,[52] and this court denied the same on July 23, 2025.[53]

    6.  *McCall's Adequate Protection Motion*

    Almost a year into the Chapter 11 cases, and months after Debtors filed the Lien Adversary, Dr. McCall filed his Notice of Non-Consent to Use of Cash Collateral (Cash Collateral Notice) on March 24, 2025,[54] asserting his lien attaches to all Debtors' assets. A few months later, on July 30, 2025, Dr. McCall filed his Motion for an Order Requiring Adequate Protection in Accordance with Section 363(e) of the Bankruptcy Code (Adequate Protection Motion).[55] Dr. McCall alleged Debtors are using cash collateral without approval as required under the Bankruptcy Code to his detriment, and he requested the court order Debtors to make adequate protection payments pursuant to Section

---

[46] Order Denying Motion to Convert, p. 9 (Ex. 17).
[47] *Id.* at pp. 14-15.
[48] *Id.* at p. 16.
[49] *Id.* at p. 20.
[50] *Id.* at p. 18.
[51] *Id.* at p. 21.
[52] Case No. 24-20138, ECF Nos. 455 and 457, respectively.
[53] Case No. 24-20138, ECF No. 464 (Ex. 18).
[54] Case No. 24-20138, ECF No. 352 (Ex. 9).
[55] Case No. 24-20138, Adequate Protection Motion, at ECF No. 466.

363(e) on account of his purported (disputed) lien interest. Dr. McCall further stated he "made numerous written requests to [D]ebtors' counsel for adequate protection payments but all requests have been ignored or refused."[56] Debtors objected to the Adequate Protection Motion.[57]

On September 26, 2025, this court entered its Order Regarding Creditor John A. McCall, Jr.'s Motion for Adequate Protection (Adequate Protection Order),[58] concluding a determination as to whether Dr. McCall has a valid lien on Debtors' assets is a prerequisite for ordering adequate protection payments, and since Dr. McCall's disputed lien is presently the subject of the Lien Adversary, the court denied the bulk of his Adequate Protection Motion as being premature. In the Adequate Protection Order, this court noted: "Because Dr. McCall styled the [Cash Collateral Notice] as a notice without any proposed order, the [Bankruptcy] Court took no further action."[59] The court declined Dr. McCall's request for adequate protection payments related to his disputed lien on assets of Huskemaw, Holdings, Arms, and Ammo, stating "McCall cannot use [the adequate protection process] to circumvent the Lien Adversary, as the primary issue [of whether McCall has a valid lien] requires an adversary proceeding."[60] The court ultimately determined it would set an evidentiary hearing only on the issue of adequate protection relating to Dr. McCall's lien on Debtor Productions' assets.[61] The court has scheduled an evidentiary hearing on the Adequate Protection Motion, solely as it relates to the assets of Debtor Productions, for January 27, 2026.[62]

7. *The Interim Fee Applications*

Pursuant to the Interim Compensation Procedures Order, this court retained jurisdiction "with respect to all matters relating to the interpretation or implementation of this Order."[63] In accordance with the Interim Compensation Procedures Order, on February 7, 2025, MWYH as Debtors' counsel filed its First Consolidated Application of Markus Williams Young & Hunsicker LLC for Interim Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. §§ 330 and 331 for the Period of April 19, 2024, to December 31, 2024.[64] On March 11, 2025, this court approved MWYH's application (Order Approving First Interim Application).[65] The Order Approving First Interim Application expressly approved and allowed counsel's interim compensation of fees in the amount of $175,210.50 and expenses in the amount of $7,080.56, for a

---

[56] Adequate Protection Motion, p. 3.
[57] Case No. 24-20138, ECF No. 474.
[58] Case No. 24-20138, Adequate Protection Order, at ECF No. 490 (Ex. 10).
[59] Adequate Protection Order, p.2, fn. 3 (Ex. 10).
[60] *Id.*, at p. 3.
[61] Adequate Protection Order, p. 5 (Ex. 10).
[62] Case No. 24-20138, ECF No. 517 (Ex. 11).
[63] Interim Compensation Procedures Order, at p. 5, ¶ 4. (Ex. 19).
[64] Case No. 24-20138, ECF No. 277.
[65] Case No. 24-20138, ECF No. 322 (Ex. 20).

total interim award of $182,291.06, as an allowed priority administrative expense, and further authorized Debtors to pay certain corresponding amounts from Debtors' respective estates.[66] The court further ordered it "shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order."[67]

On August 11, 2025, MWYH filed its Second Consolidated Application of Markus Williams Young & Hunsicker LLC for Interim Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. §§ 330 and 331 for the Period of January 1, 2025, Through July 31, 2025 (Second Interim Application).[68] On September 4, 2025, Dr. McCall filed an Objection to the Second Interim Application and also a Supplement to his Objection.[69] In his initial Objection, Dr. McCall argues the legal services attributable to the Motion for Reconsideration of Any Order Granting John A. McCall Jr. Derivative Standing to Pursue Fraudulent Transfer Claims on Behalf of Best of the West Productions, LLC (ECF No. 257) were detrimental to Debtor Productions' bankruptcy estate, and the fees for drafting the plan of reorganization and the Motion to Substantively Consolidate BOTW Holdings, LLC; Huskemaw Optics, LLC; Best of the West Productions, LLC; Best of the West Arms, LLC; Best of the West Ammo, LLC; and Long Range Store, LLC (ECF No. 286) are excessive. Dr. McCall further takes issue with specific time entries relating to state court litigation, discovery requests, and the Bankruptcy Appeal. Through the Supplement, Dr. McCall requested the Second Interim Application be denied in its entirety "because the results obtained in this Sub Chapter V case are detrimental to creditors and the bankruptcy estates," citing nearly all the same grounds he argued constituted cause to convert these Chapter 11 cases to Chapter 7.

This court's determination of the Second Interim Application is a core proceeding. At the preliminary hearing on the Second Interim Application held October 8, 2025, the court overruled the Supplement to Dr. McCall's Objection on its face.[70] As to the initial Objection, this court ordered the parties to submit affidavits, which have since been filed with the court,[71] and will issue a written decision and/or set a separate evidentiary hearing on the Objection if necessary at a later date.

The court's determination of the Second Interim Application and Objection is pending.

---

[66]  Order Approving First Interim Application, at p. 2-3 (Ex. 20).
[67]  *Id.*, at p. 4.
[68]  Case No. 24-20138, ECF No. 471.
[69]  Case No. 24-20138, ECF Nos. 478, 479 (Exs. 21 and 22).
[70]  Case No. 24-20138, ECF No. 509, Minutes of Proceeding dated October 8, 2025 (Ex. 23). Dr. McCall's local counsel Mr. Stith admitted he could not in good faith argue MWYH was not entitled to any fees for the time period covered in the Second Interim Application, contrary to the Supplement filed by his co-counsel, Mr. Kennedy, objecting to all fees.
[71]  Case No. 24-20138, ECF Nos. 520 and 521.

8.  *Plan Confirmation and Substantive Consolidation*

On February 11, 2025, and in conjunction with the filing of a previous Joint Subchapter V Plan, Debtors filed their Motion to Substantively Consolidate BOTW Holdings, LLC; Huskemaw Optics, LLC; Best of the West Productions, LLC; Best of the West Arms, LLC; Best of the West Ammo, LLC; and Long Range Store, LLC (the Substantive Consolidation Motion) requesting the court substantively consolidate the BOTW entities, effective as of the date of confirmation.[72] Dr. McCall objected to the Substantive Consolidation Motion on March 27, 2025.[73] On September 12, 2025, Debtors filed their Amended Joint Chapter 11 Subchapter V Plan of Reorganization Dated September 12, 2025, wherein they propose a five-year Plan of reorganization and payment to creditors, as well as a request to equitably subordinate Dr. McCall's claim pursuant to Section 510 based on his conduct during these Chapter 11 cases to the detriment to other creditors.[74] An evidentiary hearing on confirmation of the Plan and the Substantive Consolidation Motion is currently scheduled to commence on December 17, 2025.[75]

**Disputes in Other Forums**

Dr. McCall has instigated several lawsuits and other proceedings against non-debtor individuals in other forums to collect on his judgment or otherwise raise issues resulting from his dealings with the BOTW entities and their current or former management.

1.  *Reported Theft of Rifle and Criminal Proceeding*

At some point in the spring of 2024 (it is not clear exactly when), Dr. McCall contacted the Houston County Sheriff in Crockett about the unreturned rifle and reported it stolen. At the time, the Sheriff—an elected official—was Randy Hargrove, Dr. McCall's close friend. The Sheriff initiated criminal proceedings against Mr. Edwards and Mr. Myers, who were ultimately indicted in December 2024 for theft.[76]

At the trial on the Motion to Convert Dr. McCall testified about his text messages with Mr. Hargrove, and in the hearing on the Motion before the court, those communications were admitted into evidence, redacted to reflect only Dr. McCall's texts.[77] Dr. McCall communicated with the Sheriff about which judge should issue the warrant and which judge Dr. McCall wanted to serve on

---

[72] Case No. 24-20138, ECF No. 286.
[73] Case No. 24-20138, ECF No. 358.
[74] Case No. 24-20138, ECF No. 483.
[75] *See* Case No. 24-20138, Order Setting Hearing at ECF No. 488 (Ex. 24).
[76] Case No. 24-20138, Order Denying Motion to Convert at ECF No. 448, p. 5 (Ex. 17). Based on Dr. McCall's testimony at the hearing on the Motion to Convert that he loaned the rifle to Mr. Edwards, it is unclear to the court why Mr. Myers was also indicted for theft against "an elderly individual" for the same rifle, except that Dr. McCall transferred the rifle to an FFL (federal firearms license) for which Mr. Myers was the responsible person.
[77] Ex. 1. *See also*, Order Denying Motion to Convert, p. 5 (Ex. 17).

13

the criminal case (and which one he did not).[78] Dr. McCall prompted the Sheriff on multiple occasions for the status of the warrant.[79] He told the Sheriff to ensure the rifle "got in the system" because that was important to his "next steps."[80] Dr. McCall admitted he contacted the Sheriff to try to speed up the process.[81] And he further admitted he sent the Sheriff a list of things he wanted him to do, including: (1) have Mr. Edwards booked on criminal charges, (2) work on extradition to Texas to answer for his theft of the rifle, and (3) make sure the rifle "is in the system as stolen," so Dr. McCall can work with the ATF.[82] After Mr. Edwards was arrested, Dr. McCall told the Sheriff to "let him sit his ass in jail," and requested the mugshot.[83] And he suggested the Sheriff hint to the Judge his bond should be set high.[84] Further, Dr. McCall prompted the Sheriff to get in touch with his contact at the ATF regarding Mr. Edwards' arrest for theft of a firearm. Dr. McCall wanted the ATF to investigate Mr. Edwards immediately and hoped the ATF would raid the BOTW facility.[85] Dr. McCall specifically informed Sheriff Hargrove: "I'm going to hurt them."[86]

Dr. McCall also contacted Donna Kaspar, the Houston County District Attorney in Crockett at that time, whom he has known for years.[87] He organized a meeting with Ms. Kaspar, her investigator Tracy, Dr. McCall's counsel (Tyler Harrison), and a local attorney to "tie up some loose ends and explore new ideas" following the arrests of Mr. Edwards and Mr. Myers. After Mr. Edwards' arrest, Dr. McCall texted Ms. Kaspar requesting she not take any calls from Mr. Edwards or his counsel. Later, before the indictments became public, Tracy from the District Attorney's office texted Dr. McCall to let him know the indictments had been issued, and he asked her to have the District Attorney make sure Judge Pam Fletcher was on the case.[88]

At the hearing on the Motion to Convert, Dr. McCall rationalized his conduct as a victim advocating for his rights. The court is aware an independent grand jury issued the indictments. However, as the court previously found, and as reflected in Dr. McCall's extensive communications with law enforcement and the District Attorney's office, he controlled the narrative, and the grand jury issued the indictments against Mr. Myers and Mr. Edwards for theft from "an elderly

---

[78] Ex. 1, pp. 5-6.
[79] *Id.* at p. 6, p. 11.
[80] *Id.* at pp. 10-11.
[81] Order Denying Motion to Convert, p. 5.
[82] Ex. 1, p. 17 ("We really need that ATF raid.").
[83] *Id.* at pp. 20-21.
[84] *Id.* at p. 34.
[85] Ex. 1 at p. 21, and pp. 26-27.
[86] *Id.*, at p. 44.
[87] *See* Case No. 24-20138, Order Denying Motion to Convert at ECF No. 448, p. 5 (Ex. 17).
[88] *Id.*, at pp. 5-6.

individual," which carries an enhanced penalty under Texas law.[89] Yet Dr. McCall acknowledged the rifle that was the subject of the indictment was actually owned by his company, Stealth Vision.[90]

The ATF did in fact inspect the BOTW entities. The audit revealed two items unaccounted for, when compared to the license's bound book. Both those items pre-dated current management. The appropriate forms were filed to account for the missing items.

### 2. *Trademark Infringement Litigation*

In January 2025, Dr. McCall's company Stealth Vision initiated a lawsuit in the District Court of Houston County, Texas against non-debtor Arms and Stryk Group (Trademark Infringement Litigation).[91] Dr. McCall describes the lawsuit as one for trademark infringement, alleging the use of the word "stealth" in Arms' advertising materials was without permission and infringed on his Stealth Vision trademark. Dr. McCall obtained a temporary restraining order on January 7, 2025. The suit was later removed to the United States District Court for the Eastern District of Texas (Texas District Court) and is ongoing, but the TRO is no longer in existence.[92]

Also in January 2025, as the court has previously found, Dr. McCall's counsel Tyler Harrison distributed a flyer at the Wild Sheep Show in Reno, Nevada.[93] Dr. McCall agreed to the flyer's contents and gave Harrison approval to hand it out, although he testified it was Harrison's idea and wording. The flyer stated:

> Best of the West has intentionally infringed upon Stealth Vision's Registered TM and Intellectual Property and is currently subject to a Temporary Restraining Order . . .
>
> Best of the West company officers Jeff Edwards and Chase Myers are under felony indictment in Houston County, Texas for stealing firearms from Stealth Vision.
>
> Best of the West is currently in Bankruptcy.

As a result of handing out the flyer, the Wild Sheep Foundation revoked Harrison's privileges to attend the Sheep Show. Dr. McCall admitted the flyer was incorrect in that it represented the indictments were for the theft of multiple firearms. At the hearing on his Motion to

---

[89] Under the Texas Penal Code, for purposes of punishment, the felony of theft "is increased to the next higher category of offense if it is shown on the trial of the offense . . . the owner of the property appropriated was at the time of the offense [a]n elderly individual." Tex. Penal Code § 31.03(f)(3)(A).

[90] *See* Order Denying Motion to Convert at ECF No. 448, p. 6 (Ex. 17).

[91] Ex. C, *Stealth Vision, LLC v. Best of the West Arms et al.*, 24-0212, in the District Court for the 349th Judicial District, Houston County, Texas.

[92] *Stealth Vision, LLC v. Best of the West Arms LLC et al.*, Civil Action No. 9:25-cv-00006-MJT, United States District Court for the Eastern District of Texas (Trademark Infringement Litigation).

[93] *See* Case No. 24-20138, Order Denying Motion to Convert at ECF No. 448, p. 6 (Ex. 17).

Convert, Dr. McCall testified the intent of the flyer was not to prohibit people from doing business with "Best of the West," but rather, to "correct" the trademark infringement.[94]

In May of 2025, Stealth Vision amended its complaint in the Trademark Infringement Litigation to name Jeff Edwards and Charles Myers as additional defendants, alleging—among many other things—that during Debtors' "bankruptcy cases—which have been pending now for over a year without any confirmed plan in place—Defendants Edwards and Myers have been liquidating inventory that is secured by Dr. McCall's lien and have used the cash to pay themselves and other insiders."[95] Among other things, in its amended complaint, Stealth Vision seeks damages for conversion against Stryk Group, Mr. Edwards, and Mr. Myers based on the alleged theft of the rifle, as well as for breach of contract against Stryk Group, arising out of Stealth Vision's former memorandum of understanding with Stryk Group.[96]

### 3. *The Texas Litigation*

Since the filing of the Chapter 11 cases, Dr. McCall has continued his efforts to collect on his Judgment outside of the Bankruptcy Court. Post-petition, on February 26, 2025, Dr. McCall commenced a lawsuit in the 3rd District Court of Houston County, Texas, naming Jeffrey Edwards, Chase Myers, their spouses, as well as former owners of the BOTW entities, Joseph Michaletz and Christine Michaletz (Texas Litigation). The Texas Litigation was subsequently also removed to the Texas District Court.[97]

The Original Petition filed by Dr. McCall in the Texas Litigation contained a single claim for relief for "Enforcement of Judgment," in which Dr. McCall sought to enforce the Judgment entered against Debtors and collect from the named defendants. As this court previously determined:

> Rather than pursuing his claims through the orderly process of this court, Dr. McCall has engaged in an aggressive campaign of parallel litigation and extrajudicial pressure. *This includes initiating lawsuits against Debtors' principals in their individual capacities, as well as against their spouses – individuals with no direct involvement in the business – solely to exert maximum personal and financial pressure.* Moreover, Dr. McCall has advocated for, and apparently coordinated, criminal investigations resulting in indictments of Debtors' principals, a move that suggests punitive rather than remedial intent.[98]

---

[94] According to the text messages, Dr. McCall was going to get a TRO so the BOTW entities "can't attend shows." Ex. 1, p. 43.
[95] *Stealth Vision, LLC v. Best of the West Arms LLC et al.*, Civil Action No. 9:25-cv-00006-MJT, United States District Court for the Eastern District of Texas, ECF No. 45, ¶ 90.
[96] *Id.* at pp. 20-21.
[97] United States District Court for the Eastern District of Texas, Civil Action No. 25-cv-00091-MJT.
[98] Case No. 24-20138, Order Denying Motion to Convert at ECF No. 448, p. 9 (internal citations omitted) (emphasis added) (Ex. 17).

16

On September 29, 2025, Dr. McCall and Stealth Vision authorized and voluntarily filed the Plaintiffs' First Amended Complaint in the Texas Litigation.[99] The First Amended Complaint added Stealth Vision as a named plaintiff and removed Mr. Myers' and Mr. Edwards' spouses as named defendants. The First Amended Complaint was signed by Kirk Kennedy of The Kennedy Law Firm and Jack P. Carroll of Orgain, Bell & Tucker, L.L.P. as counsel for plaintiffs, Dr. McCall and Stealth Vision. The First Amended Complaint names Jeffrey Edwards, Chase Myers, Stryk Group, Joseph Michaletz, Christine Michaletz, and Bradley Hunsicker (Debtors' bankruptcy counsel) as defendants, and contains three completely different claims for relief than those asserted in the Original Petition filed in the Texas Litigation: (1) Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., (RICO); (2) Conspiracy to Violate RICO; and (3) Civil Conspiracy (together, the Civil Claims).

The latest round of claims by Dr. McCall are premised on an alleged "RICO enterprise," which Dr. McCall and Stealth Vision describe as "an association of the following companies, individuals and organizations: Best of the West Holdings, LLC, Best of the Arms, LLC, Best of Best of the West Productions, LLC, Huskemaw Optics, LLC, Long Range Store, LLC, Spotted Bear Marketing, LLC, the Joseph G. Michaletz Revocable Living Trust, the Christine E. Michaletz Revocable Living Trust, Michaletz Holdings, LLC, Yellowstone Avenue, LLC, Yellowstone Natural Holdings, LLC, River Ridge Gun and Archery Club, Stryk Group Holdings, LLP, Jack Peterson, and [the Honorable Judge] Joseph Darrah."[100]

The allegations and claims asserted in the Texas Litigation include various matters previously and fully adjudicated before this court and resolved by this court (and, with respect to the Stryk Payment Order, affirmed by the Wyoming District Court). The allegations and claims asserted in the Texas Litigation also include various pending matters which will be resolved by this court in due course through various contested matters and adversary proceedings already pending, as described above. The allegations and claims asserted in the Texas Litigation also collaterally attack various findings of fact and orders entered by this court and/or seek to relitigate matters either already adjudicated and resolved by this court (and, with respect to the Stryk Payment Order, affirmed by the Wyoming District Court).

**Overlap of Bankruptcy Disputes and Texas Litigation**

Dr. McCall's and Stealth Vision's Civil Claims in the Texas Litigation are based on conduct substantially identical to, and inextricably intertwined with, the same conduct that is the subject of issues that have already been determined, or are yet to be heard, by this court. Many of the Civil

---

[99]   Ex. 3 (filed under seal), Ex. 4 (redacted).
[100]  Ex. 4, p. 2, n.1.

Claims' allegations involve the actions of Debtors and their counsel previously challenged by Dr. McCall in the various contested matters and adversary proceedings within the Chapter 11 cases, some of which this court has expressly approved. For example, Dr. McCall alleges:

> During the bankruptcy case, Defendants Edwards and Myers have stripped cash from the bankruptcy estates to pay consulting fees in the amount of $50,000 per month to Stryk Group USA. With the help of Defendant Hunsicker, they have been liquidating inventory without replenishing it. These monthly $50,000 payments to Stryk Group are authorized by the COO Charles Myers are made by direct debit from the Debtors' DIP operating account with Glacier Bank to Stryk Group USA, LLC (also owned and operated by Edwards and Myers) and thus make use of the wires to pay insiders. Edwards and Myers are also paying other members of the RICO Enterprise using the wires including: (a) Spotted Bear Marketing, monthly payments of $8,333 (owned by Edwards, Myers and the Michaletz), (b) Yellowstone Avenue LLC, $7,000 per month (100% owned by the Michaletz), (c) Jack Pederson and Dale Caldwell (former owners who are owed money by the Michaletz), (d) Michaletz Holdings, LLC (100% owned by the Michaletz), (e) Brad Hunsicker and his law firm, Markus Williams Young and Hunsicker, LLP, which have racked up over $500,000 in fees for the express purpose of keeping Edwards and Myers in control of the chapter 11 process and engaging in legal action to subordinate Dr. McCall's secured claim so that he receives nothing. This is all part of the RICO Defendants fraudulent plan since September 2020 when the Michaletz first created the new subsidiaries: implement a pattern fraudulent and illegal transactions to keep control of the RICO Enterprise, liquidate assets, and pay the RICO Defendants and at the same time use the courts and legal processes block Dr. McCall from any recovery.[101]

The above allegations in the First Amended Complaint directly implicate, at a minimum, this court's findings and conclusions reached in the Stryk Payment Order (and in the subsequent appellate order affirming this court), the Order Denying Motion to Convert, and this court's jurisdiction over matters relating to the approval and payment of MWYH's fees from Debtors' bankruptcy estates.[102] Such allegations appear to directly contradict some of the findings this court has previously made, and payments this court has expressly approved over Dr. McCall's objections.

Another example of Dr. McCall's misleading allegations in the Texas Litigation as to matters pending before (but yet to be decided by) this court, are his allegations therein that he has a "perfected lien on all company assets," stating for example:

a. "Despite having invested more $2.4 million in the Best of the West Companies [defined as including all of the Debtors], despite having a perfected lien on all company assets, and despite having been awarded a multi-million-dollar judgment against Best of the West Companies in 2023, Dr. McCall has not been

---

[101] First Amended Complaint, at p. 28, ¶ 112 (Ex. 4).

[102] *Compare*, Order Denying Motion to Convert, at pp. 13-16 (Ex. 17); Stryk Payment Order, at pp. 8, 10-12 (Ex. 14); Affirming Order, at pp. 2-3, 9-11, 14-15 (Ex. 15); Interim Compensation Procedures Order, at p. 5, ¶ 4 (Ex. 19); Order Approving First Interim Application, at pp. 2-4 (Ex. 20); and Minute Order (Ex. 23); with First Amended Complaint (Ex. 4), at p. 27, ¶¶ 109-10; p. 28, ¶ 112; p. 30, ¶ 114(ii); p. 31, ¶ 114(vi); pp. 44-45, ¶ 151(a); p. 46, ¶ 152(a); pp. 46-48, ¶ 152(b); p. 51, ¶ 167(j); p. 52, ¶ 167(m); and p. 50, ¶ 163(f).

paid a single dime from the Best of the West Companies on his investment or Judgment since he initially capitalized the company in 2016. . . ."[103]

b.  "Their plan was to secretly transfer the assets and firearms owned by BOTW Productions (and subject to Dr. McCall's lien) to the newly formed subsidiaries, BOTW Arms and BOTW Ammo. . . ."[104] and

c.  "The [sic] each of the Defendants are all members of conspiracy of two or more persons. The object of their conspiracy was an unlawful purpose: to enrich themselves and prevent Dr. McCall from any recovery on his Judgment and prevent him from obtaining any monetary recovery from the Best of the West Companies and prevent him from recovering any money from the Best of the West bankruptcy estates."[105]

Such allegations implicate this court's Order Denying Motion to Convert, the Lien Adversary, the Adequate Protection Order, and the proposed treatment of Dr. McCall under the pending Plan.[106]

Dr. McCall further alleges in the Civil Claims that certain pre-petition transfers of the Debtors' assets are fraudulent conveyances that Dr. McCall can recover for his benefit, including but not limited to, the following:

a.  "There was a final step to this fraud. After transferring the firearms inventory subject to Dr. McCall's lien to BOTW Arms, the Michaletz then started to sell and dispose of those fraudulently transferred firearms in various transactions with out-of-state customers and transferees."[107]

b.  "These transfers confirms [sic] that the mail was used to transfer firearms subject to Dr. McCall's lien in order in furtherance of the fraudulent scheme to deprive Dr. McCall of his property rights as a lienholder in the firearms previously owned BOTW Productions."[108] and

c.  "This fraudulent scheme of selling firearms subject to Dr. McCall's lien and claims would be continued by Defendant Charles Myers after Edwards and Myers purportedly purchased the Best of the West Companies from the Michaletz for $1 [on] March 8, 2024."[109]

---

[103] First Amended Complaint, at p. 3, ¶ 5 (Ex. 4).
[104] *Id.* at p. 16, ¶ 53.
[105] *Id.* at p. 51, ¶ 166.
[106] Compare, Order Denying Motion to Convert, at p. 8 (Ex. 17); Adequate Protection Order, at pp. 3-5 (Ex. 10); and generally, the Plan (Case No. 24-20138, ECF No. 483); with First Amended Complaint (Ex. 4), at p. 3, ¶ 5; p. 7, ¶ 17; p. 16, ¶ 53; and p. 51, ¶ 166.
[107] First Amended Complaint, at p. 17, ¶ 56 (Ex. 4).
[108] *Id.*, at pp. 17-18, ¶ 57.
[109] *Id.*, at p. 18, ¶ 60.

Such allegations directly implicate, at a minimum, the Order Denying Motion to Convert, the Derivative Claims Adversary, the McCall Adversary, the Lien Adversary, the Adequate Protection Order, and the proposed treatment of Dr. McCall under the Plan.[110]

Notably, in his First Amended Complaint, Dr. McCall asks the Texas District Court to award him and Stealth Vision—and not the bankruptcy estates, for the benefit of all creditors—damages against non-debtors for postpetition payments received from Debtors that were expressly authorized by this court's orders, and/or other relief for which he already seeks redress in this court under multiple sections of the Bankruptcy Code.

**Motion for Preliminary Injunction**

Debtors move for a preliminary injunction against Defendants Dr. McCall and Stealth Vision, enjoining all efforts by Defendants to prosecute the Civil Claims until such time as this court finally resolves the claims made in Debtors' Complaint for injunctive relief enjoining Defendants from further pursuing such claims consistent with the duration of the automatic stay under Section 362(c)(2), until the earliest of (a) the date the case is closed, or (b) the date the case is dismissed.[111] Debtors assert the filing of the Civil Claims is an attempt to usurp this court's jurisdiction over the administration of Debtors' bankruptcy estates and over claims and issues for which Dr. McCall has already consented to or otherwise subjected himself to the jurisdiction of this court. Debtors further assert the filing of the Civil Claims is an attempt to exercise control over legal counsel for the bankruptcy estates herein and manufacture an issue of "disinterestedness" of approved counsel for Debtors in the Chapter 11 cases. Debtors contend the filing of the Civil Claims is a continuation of Dr. McCall's aggressive campaign of parallel litigation and extrajudicial pressure, rather than pursuing his claims through the orderly process of this court. As a proximate cause of the filing of the Civil Claims, Debtors assert they have suffered and will continue to suffer irreparable harm, including but not limited to the expense and inconvenience of addressing baseless claims in a remote jurisdiction that, while not asserted directly against Debtors, inexorably relate to Debtors' bankruptcy estates and their counsel, which are under the supervision and jurisdiction of this court, and which will necessarily distract Debtors' principals, employees, and counsel away from the pending and pressing matters pending before this court, including Plan confirmation.

---

[110] Compare, Order Denying Motion to Convert, at p. 22 (Ex. 17); Derivative Claims Adversary, at ¶¶ 1, 10 12, 24, 28, 32 and 40 (Ex. 29); McCall Adversary, at ¶9 (Ex. 8); and generally, the Plan (Case No. 24-20138, ECF No. 483); with First Amended Complaint (Ex. 4), at pp. 5-6, ¶ 12; p. 7, ¶ 15; p. 16, ¶ 53; pp. 16-17, ¶ 54; p. 17, ¶ 56; pp. 17-18, ¶ 57; and p. 18, ¶ 60.

[111] *See* Complaint at ECF No. 1, p. 29.

**Jurisdiction**

Dr. McCall asserts this is not a core matter and therefore, this court only has authority to issue recommended findings of fact and conclusions of law to the United States District Court. This court disagrees. The court's focus for jurisdictional purposes is on this adversary proceeding itself and the relief sought herein.[112] In their Complaint, Debtors seek relief under Sections 105 and 362(a) of the Bankruptcy Code, for a declaratory judgment extending the automatic stay to the Civil Claims, and for injunctive relief enjoining Defendants' prosecution of the Civil Claims consistent with the duration of the automatic stay under Section 362(c)(2) until the earliest of (a) the date the case is closed, or (b) the date the case is dismissed.[113] In the Motion, Debtors seek a preliminary injunction, enjoining Defendants from prosecuting the Civil Claims pending the outcome of the trial on the merits in this proceeding.

Admittedly, bankruptcy courts are courts of limited jurisdiction.[114] Under 28 U.S.C. §§ 157(a) and 1334:

> [b]ankruptcy courts, upon referral from the federal district courts, may exercise jurisdiction over three types of proceedings: (1) cases under title 11; (2) civil proceedings "arising under" or "arising in" a case under title 11; and (3) civil proceedings "related to" cases under title 11. Core proceedings, or proceedings "arising under" or "arising in," are claims that have no existence outside of bankruptcy. "Related to" proceedings are those that do not depend on bankruptcy law for their existence.[115]

"A proceeding 'arises under' the Bankruptcy Code if it asserts a cause of action created by the Code . . . [whereas] [p]roceedings 'arising in' [a] bankruptcy case are those that could not exist outside of a bankruptcy case, but that are not causes of action created by the Bankruptcy Code."[116] "Core proceedings are '[c]ases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11,' while non-core proceedings are 'related to a case under title 11.' "[117] To determine "related to" jurisdiction, the test is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[118]

---

[112] *See, e.g., Halper v. Halper*, 164 F.3d 830, 837 (3d Cir. 1999) (instructing courts to conduct a claim-by-claim analysis *of the action presented to the bankruptcy court* to determine the extent of the bankruptcy court's jurisdiction).

[113] Complaint, ECF No. 1.

[114] *See* 28 U.S.C. §§157 and 1334.

[115] *In Play Membership Golf, Inc. v. Billy Casper Golf, LLC (In re In Play Membership Golf, Inc.)*, 576 B.R. 15, 20–21 (Bankr. D. Colo. 2017) (citing *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990)).

[116] *Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764, 771 (B.A.P. 10th Cir. 1997).

[117] *Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minnesota, LLC)*, 47 F.4th 193, 198 (3d Cir. 2022) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004) (internal quotations omitted)).

[118] *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984) (emphasis omitted)).

Courts routinely recognize extending the stay under Section 362 is a core matter: under the "arising under" or "arising in" prongs, courts have jurisdiction to determine a cause of action under Section 362(a), since it depends " '[o]n a right created or determined by a statutory provision of title 11,' and by its very nature would have 'no existence outside of the bankruptcy.' "[119] The court's authority under Section 105 is not as straightforward, as courts differ in their analysis.[120] However, this court agrees with others that conclude extending the automatic stay and issuing an injunction to non-debtor third parties pursuant to Sections 362 and 105 qualify as "core" proceedings.[121]

> [S]ince the Bankruptcy Code both imposes the automatic stay and provides the Debtors and the Court with the means to invoke it and to implement its protections, it is manifest that any proceeding to determine the scope and applicability of the automatic stay "arises under" the Bankruptcy Code.[12] Moreover, common sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay, then it has jurisdiction over a related motion for preliminary injunctive relief.[122]

As the matter is within this court's core jurisdiction, Dr. McCall's request to abstain is not well taken. "The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include 'suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate,' or 'the allocation of property among creditors.' "[123] To protect the bankruptcy court's jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"

---

[119] *In re Green Scene, Inc.*, No. BKR. 10-B-72521, 2010 WL 2465399, at *2 (Bankr. N.D. Ill. June 16, 2010) (quoting *Nelson v. Welch (In re Repository Techs., Inc.)*, 601 F.3d 710, 721 (7th Cir. Apr.12, 2010)).

[120] *Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK), 2024 WL 4579207, at *4 (Bankr. D.N.J. Oct. 24, 2024) ("Nevertheless, this Court is mindful that other courts still view the question as unsettled."). *See also In re LTL Mgmt., LLC*, 645 B.R. 59, 70 (Bankr. D.N.J. 2022) ("Admittedly, where an adversary proceeding seeks to enjoin a third-party action, the focus of the jurisdictional inquiry becomes convoluted. The analysis is further complicated due to the lack of certainty regarding the proper basis—§ 105(a), § 362(a), or a court's inherent powers—for issuing a preliminary injunction that extends the protection of § 362(a) to nondebtors.").

[121] *See, e.g., LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, No. CV 21-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (citing *FPSDA II, LLC v. Larin (In re FPSDA I)*, No. 12-08032, 2012 WL 6681794, at **1, 5 (Bankr. E.D.N.Y. Dec. 21, 2012) (finding "arising under" jurisdiction over motion to extend a section 362 automatic stay and – a section 105 injunction covering claims against non-debtor third parties, which therefore qualified as a "core" proceeding); *In re Brier Creek Corp. Ctr. Assoc. Ltd. P'ship*, No. 12-01855, 2013 WL 144082, at *1 (Bankr. E.D.N.C. Jan. 14, 2013) ("A request for relief under 11 U.S.C. § 362(a)(1) to determine that the stay applies to non-debtors and a request for relief under 11 U.S.C. § 105 to extend the stay to non-debtors constitute core proceedings arising under title 11 for which this court has jurisdiction to hear and decide.").

[122] *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *5 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012).

[123] *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (internal citations omitted).

including a stay of non-debtor litigation.[124]

**Discussion**

      Before the court addresses the issues raised in the Motion, a discussion of a few basic

bankruptcy principles is in order:

      *The Automatic Stay*

      Under Section 362(a) of the Bankruptcy Code, the filing of a Chapter 11 petition "operates

as a stay, applicable to all entities," of various enumerated actions, including but not limited to:

> (1) the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other action or proceeding
> against the debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover a claim against the debtor
> that arose before the commencement of the case under this title . . .
>
> (2) the enforcement, against the debtor or against property of the estate, of a
> judgment obtained before the commencement of the case under this title; and
>
> (3) any act to obtain possession of property of the estate or of property from
> the estate or to exercise control over property of the estate. . . .[125]

The automatic stay and the breathing space it provides "is one of the fundamental tenets of the

Bankruptcy Code."[126] The automatic stay "[p]ermits the debtor to attempt a repayment or

reorganization plan"[127] The stay:

> [a]lso provides creditor protection. Without it, certain creditors would be able to
> pursue their own remedies against the debtor's property. Those who acted first would
> obtain payment of the claims in preference to and to the detriment of other creditors.
> Bankruptcy is designed to provide an orderly liquidation procedure under which all
> creditors are treated equally.[128]

      While the automatic stay generally does not stay actions against non-debtors, courts—

including the Tenth Circuit—will extend the automatic stay to non-debtors if "unusual

circumstances" are present, as "when there is such identity between the debtor and the third-party

defendant that the debtor may be said to be the real party defendant and that a judgment against the

---

[124] *Id.* (citing 11 U.S.C. § 105(a); *Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir. 1994) and *In re Memorial Estates, Inc.*, 950 F.2d 1364, 1368 (7th Cir. 1992)).

[125] 11 U.S.C. §§ 362(a)(1), (2), and (3).

[126] *In re Anthem Communities/RBG, LLC*, 267 B.R. 867, 877 (Bankr. D. Colo. 2001); *see also*, *In re James*, 120 B.R. 802, 809 (E.D. Pa. 1990), *rev'd on other grounds*, 940 F.2d 46 (3d Cir. 1991) ("[t]he automatic stay provision is central to the administration of bankruptcy suits as it represents 'one of the fundamental debtor protections provided by the bankruptcy laws.' ") (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S. Code & Ad. News 5787, 5963, 6296).

[127] *In re Trujillo*, 485 B.R. 238, 252 (Bankr. D. Colo. 2012) (quoting H.R.Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97 (capitalization altered)).

[128] *Id.*

third-party defendant will in effect be a judgment or finding against the debtor."[129]

Factors courts have found relevant include:

1) the debtor is contractually obligated to indemnify the principal for the costs and
liabilities incurred in connection with the suit to be enjoined, 2) the issues involved in
the suit against the nondebtor are so entwined with potential issues in a suit against
the debtor that the debtor may have concerns that it might face issue preclusion if it
does not participate in the suit against the nondebtor, 3) the suit against the nondebtor
includes such onerous discovery that the suit will impose substantial time burdens on
the nondebtor, and the nondebtor's efforts are essential to the reorganization of the
debtor, and 4) the reorganization plan requires capital infusions by the nondebtor, and
the suit will severely impair the nondebtor's ability to raise such funds.[130]

"[A] critical factor in deciding whether to extend the stay is the potential adverse impact on a
debtor's estate and prospect of reorganization."[131]

Some courts also consider "record taint."[132] "The Third Circuit [i]ncorporates the concept of
'record taint' as part of its 'broad[ ] view of the potential impact on the debtor.' "[133] This includes the
risk the evidentiary record created in a case against a nondebtor could later be used in a case against
the debtor.[134] The risk of "record taint" is greatest when the claims against the debtor and the
nondebtor implicate the same transactions, the same time periods, and the same alleged harms.

### The Bankruptcy Estate

Under Section 541 of the Bankruptcy Code, upon a debtor's bankruptcy filing, an estate is
created that is defined broadly to include "all legal or equitable interests of the debtor in property as
of the commencement of the case[,]" "wherever located and by whomever held[.]"[135] "The
Bankruptcy Code's ultimate goal is to balance the equities and interests of all affected parties

---

[129] *A.H. Robins, Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), *cert. denied,* 479 U.S. 876 (1986); *see also,*
*Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141 (10th Cir. 1994) (citing the
"unusual circumstances" exception adopted by the court in *A.H. Robins*); *Robert W. Thomas & Anne*
*McDonald Thomas Revocable Tr. v. Inland Pac. Colorado, LLC*, No. 11-CV-03333-WYD-KLM, 2013 WL
708493, at *2–3 (D. Colo. Feb. 26, 2013) ("Several courts have held [t]he automatic stay can be extended to
the debtor's co-defendants if the continued litigation would impact the bankruptcy proceeding and/or the
purposes of the automatic stay provision. . . . Consistent with this, the Tenth Circuit has indicated that the
narrow exception may apply when it is necessary to further the policies underlying 11 U.S.C. § 362.")
(citing *Mason v. Okla. Turnpike Auth.,* 115 F.3d 1442, 1450 (10th Cir. 1997), *overruled on other grounds by TW*
*Telecom Holdings Inc. v. Carolina Internet Ltd.,* 661 F .3d 495 (10th Cir. 2011)).

[130] *In re Green Scene, Inc.*, No. BKR. 10-B-72521, 2010 WL 2465399, at *3 (Bankr. N.D. Ill. June 16, 2010)

[131] *In re LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 638 B.R. 291,
306 (Bankr. D.N.J. 2022).

[132] *In re LTL Mgmt., LLC v. State of New Mexico (In re LTL Mgmt., LLC)*, 645 B.R. 59, 78-79 (Bankr. D.N.J. 2022)
(citations omitted).

[133] *Id.* at 78 (citing cases).

[134] *Id.* (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984)).

[135] 11 U.S.C. § 541(a)(1).

involved in a bankruptcy case."[136] Thus, courts construe section 541 broadly to further this fundamental bankruptcy policy of equitable distribution to all creditors.[137] "In bankruptcy proceedings, '[p]roperty interests are created and defined by state law.' "[138] Once state law is determined and applied, bankruptcy courts then "look to federal bankruptcy law to resolve the extent to which that interest is property of the estate."[139]

### The Barton Doctrine

The court next reviews the *Barton* doctrine.

In *Barton*, the Supreme Court explained that requiring a party with claims against the receiver to obtain permission before filing suit in another jurisdiction would help to prevent the "usurpation of the powers and duties which belonged exclusively to [the appointing] court" and protect "the duty of that court to distribute the trust assets to creditors equitably and according to their respective priorities."[140]

The Tenth Circuit has acknowledged the *Barton* doctrine is jurisdictional in nature;[141] it "strips all courts—except the bankruptcy court that appointed the trustee—of subject-matter jurisdiction to hear a lawsuit against the trustee unless the appointing court gives its permission to sue the trustee elsewhere."[142]

Courts have extended the *Barton* doctrine to trustees,[143] trustees' counsel,[144] debtors-in-possession,[145] debtors-in possession counsel, and a debtor's principals in their role as fiduciaries to

---

[136] *In re Crawford*, No. BR 11-24158-SBB, 2012 WL 930281, at *7 (Bankr. D. Colo. Mar. 19, 2012) *(quoting ANR Ltd. Inc. v. Chattin*, 89 B.R. 898, 903 (D. Utah 1988)).

[137] *ANR Ltd. Inc.,* 89 B.R. at 903*; see also, In re Dittmar*, 618 F.3d 1199, 1207 (10th Cir. 2010) ("[T]he scope of § 541 is broad and should be generously construed").

[138] *In re Chernushin*, 911 F.3d 1265, 1269 (10th Cir. 2018) (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).

[139] *Id.* (quoting *In re Marshall*, 550 F.3d 1251, 1255 (10th Cir. 2008) (internal quotation marks omitted)).

[140] *Kaul v. Fed'n of State Med. Boards*, No. 19-CV-3050 (TSC), 2021 WL 1209211, at *11 (D.D.C. Mar. 31, 2021) (quoting *Barton v. Barbour*, 104 U.S. 126, 128–29, 136 (1881)).

[141] *Satterfield v. Malloy*, 700 F.3d 1231, 1234 (10th Cir. 2012) (citing *Barton*, 104 U.S. at 131 (explaining without leave of the appointing court, another court has "no jurisdiction to entertain a suit" against a receiver).

[142] *In re Christensen*, 598 B.R. 658, 665 (Bankr. D. Utah 2019) (quoting *Baron v. Sherman (In re Ondova Ltd.)*, Adv. No. 14-03121-SGJ, 2017 WL 477776, at *9 (Bankr. N.D. Tex. Feb. 1, 2017), *report and recommendation adopted*, No. 3:16-CV-00947-M, 2018 WL 580151 (N.D. Tex. Jan. 26, 2018), *aff'd*, 914 F.3d 990 (5th Cir. 2019)).

[143] *See, e.g., Satterfield v. Malloy*, 700 F.3d at 1234–35.

[144] *See, e.g., Lankford v. Wagner*, 853 F.3d 1119, 1122 (10th Cir. 2017) ("leave of the Bankruptcy Court must be granted before a suit may be brought against counsel for trustee, in their capacity as counsel for trustee, since such suit is essentially a suit against the trustee.") (citing cases).

[145] *See, e.g., In re Gen. Growth Props., Inc.*, 426 B.R. 71, 75 (Bankr. S.D.N.Y. 2010) ("[i]t is well settled [s]uch fiduciary cannot be sued in state court without leave of the bankruptcy court for acts done in his official capacity and within his authority as an officer of the court.") (quoting *In re Balboa Improvements, Ltd.,* 99 B.R. 966, 970 (9th Cir. BAP 1989) (debtor-in-possession case). *See also, Helmer v. Pogue*, No. 2:12-CV-1635-VEH, 2012 WL 5231153, at *11 (N.D. Ala. Oct. 22, 2012) (applying the *Barton* doctrine to debtor-in-possession).

the estate,[146] and other officers the bankruptcy court appoints.[147] The fact the Texas Litigation
involves RICO claims and is viewed under a RICO "lens" does not change the doctrine's
applicability.[148]

Part of the *Barton* doctrine's rationale is that "a judgment against the trustee or debtor in
possession may affect the administration of the estate."[149] Uniform application of bankruptcy law is
required, so "all legal proceedings that affect the administration of the bankruptcy estate [must] be
either brought in the bankruptcy court or with the permission of the bankruptcy court."[150] The
doctrine ensures one creditor does not bring suit to gain advantage over other creditors in the
distribution of the estate's assets.[151]

The court acknowledges Dr. McCall has dismissed Mr. Hunsicker, Debtors' counsel, as a
defendant from the Texas Litigation, and he also withdrew his opposition to a preliminary
injunction against prosecution of the Texas Litigation against Chase Myers, Debtors' Chief
Operating Officer. However, the injunction sought is temporary in nature, and even once no longer
effective, the *Barton* doctrine implicates claims against court fiduciaries without following the
appropriate steps.[152]

### Claims Pursued by Dr. McCall and Stealth Vision

Each of the above bankruptcy concepts ties into the court's discussion. The court roughly
categorizes the Civil Claims as follows:

1) Fraudulent transfer claims (including allegations about the corporate restructuring of the
   BOTW entities into Holdings, Arms, and Ammo, and the pre-petition transfer(s) of
   Productions' assets);

---

[146] *In re W.B. Care Ctr., LLC*, 497 B.R. 604, 611 (Bankr. S.D. Fla. 2013); *see also, Gordon v. Nick*, 162 F.3d 1155
*2 (4th Cir. 1998) (unpublished) (*Barton* doctrine applied to suits against a managing partner of the debtor);
*In re Gen. Growth Props., Inc.*, 426 B.R. 71, 74 (Bankr. S.D.N.Y. 2010) ("Under the circumstances of this
case, an action against the Board, whose members act as officers of the court, implicates the *Barton*
doctrine.").

[147] *See, e.g.*, *Helmer v. Pogue*, 2012 WL 5231153, at *5.

[148] *See Kaul v. Fed'n of State Med. Boards*, 2021 WL 1209211, at *13 (rejecting argument that the *Barton* doctrine
did not apply in cases of racketeering, bribery, or conspiracy); *Sharif v. Fox (In re Sharif)*, 627 B.R. 889, 900–
01 (Bankr. N.D. Ill. 2021) (finding Plaintiff could not sue trustee or his attorneys regarding their conduct in
the bankruptcy case under RICO without first obtaining leave of the bankruptcy court); *Reinert v. Bould*, No.
15-cv-0542, 2015 WL 6760510, at *4 (W.D. Pa. Nov. 5, 2015) (finding complaint alleging trustee and his
agents "engaged in a 'scam' to 'deprive the bankruptcy estate(s) of assets' " fell within *Barton* doctrine).

[149] *In re W.B. Care Ctr., LLC*, 497 B.R. 604, 610 (Bankr. S.D. Fla. 2013).

[150] *Id.* (quoting *In re VistaCare Group*, 678 F.3d 218, 227–28 (3rd Cir. 2012) (*citing In re Crown Vantage,* 421 F.3d
963, 971 (9th Cir. 2005)).

[151] *Id.* (citing *In re VistaCare Group*, 678 F.3d at 224).

[152] *Mangun v. Bartlett (In re Balboa Improvements, Ltd.)*, 99 B.R. 966, 970 (B.A.P. 9th Cir. 1989) ("Jurisdiction
over a claim of misconduct by the debtor's attorney in the administration of an estate may be analogized to
the exclusive jurisdiction over similar claims against a court-appointed trustee or debtor-in-possession. It is
well settled that such fiduciary cannot be sued in state court without leave of the bankruptcy court for acts
done in his official capacity and within his authority as an officer of the court.") (citation omitted).

2)  Contract claims (against Stryk Group);

3)  Theft of the rifle system;

4)  Trademark infringement claims;

5)  Transactions involving the administration of Debtors' bankruptcy estates; and

6)  Transactions involving Debtors' counsel, Brad Hunsicker.

If Dr. McCall named Debtors as defendants in the Texas Litigation, it is beyond dispute his action would violate the automatic stay. The catch here is he is suing third parties who are not in bankruptcy, and who allegedly committed various acts of fraud against him—the RICO Defendants, as Dr. McCall labeled them. Despite recognizing the majority of the alleged harm injured Debtors' creditors, Dr. McCall argues these same Defendants independently injured him, and he is therefore entitled to pursue his own actions outside of the umbrella of the bankruptcy proceeding.

The court must consider whether the Civil Claims against the non-debtor defendants in the Texas Litigation are property of (or sufficiently closely related to the property of) Debtors' estates.[153] The court must also examine the kinds of claims belonging to the estate that only a trustee may bring once a bankruptcy proceeding has begun. Reserving actions for the trustee "maintains the integrity of the bankruptcy proceeding and ensures that individual creditors cannot hijack the bankruptcy process. If it were otherwise, there would be 'a multijurisdictional rush to judgment whose organizing principle could only be first-come-first-served.' "[154]

The trustee has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors.[155] Second, the trustee is also the only party who can sue to represent the interests of the creditors as a class, but the trustee has no standing to bring personal claims of creditors.[156] When all creditors are injured through alleged unlawful payments, the claims become property of the estate.[157] "[T]the trustee has the sole right and responsibility to bring claims on behalf of the estate and on behalf of creditors as a class—so-called

---

[153] The court references primarily cases involving trustees. However, the analysis does not change with a debtor in possession, who has the same powers as a trustee. *See Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990) ("[A] debtor in possession is clothed with all powers of a trustee." (citing 11 U.S.C. § 1107(a) ("[A] debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee.) *See also, In re Signia, Ltd.,* No. AP 24-1214 TBM, 2025 WL 1409225, at *18 (Bankr. D. Colo. May 14, 2025).

[154] *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 442 (4th Cir. 1999) (quoting *American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),* 714 F.2d 1266, 1274 (5th Cir. 1983)).

[155] *Newsome v. Gallacher,* 722 F.3d 1257, 1267 (10th Cir. 2013).

[156] A personal claim is one in which the claimant is harmed and "no other claimant or creditor has an interest in the cause." *Levey v. Sys. Div., Inc. (In re Teknek, LLC),* 563 F.3d 639, 646 (7th Cir. 2009) (quoting *Fisher v. Apostolou,* 155 F.3d 876, 879 (7th Cir. 1998) (further citation omitted)).

[157] *Transportation All. Bank, Inc. v. Arrow Trucking Co.*, 766 F. Supp. 2d 1188, 1201 (N.D. Okla. 2011)

'general' claims."[158]

The court acknowledges the contract claim, the alleged theft of the rifle, and the trademark infringement claims are unique to Stealth Vision and Dr. McCall. But while claims that allege direct injuries not common with other creditors are appropriate,[159] "[c]ourts recognize that a creditor lacks standing to bring a RICO claim against corporate fiduciaries where the creditor is harmed only indirectly and has sustained an injury common with other creditors."[160] At the same time, Dr. McCall cannot dispute the fraudulent transfer claims belong to the estate, as he sought and was granted derivative standing by this court to pursue those claims.[161]

The allegations that implicate transactions related to the administering Debtors' bankruptcy estates are under this court's core jurisdiction and belong to the estate:

> [A] bankruptcy trustee has standing to pursue the creditors' claim for breach of fiduciary duty. . . "a bankruptcy trustee may assert *only* the claims that belong to the bankruptcy estate," but "those claims may *include* the interests of creditors in the sense that the trustee has the duty to marshal the assets of the estate so that they can be distributed to creditors on a *pro rata* basis."[162]

The Tenth Circuit has generally observed the bankruptcy estate includes "any actions that a debtor corporation may have to recover damages for fiduciary misconduct, mismanagement or neglect of duty."[163] In Wyoming, breaches of fiduciary duties inure to the corporation and not to individual creditors.[164] Because the claims belong to the corporation, it belongs to the debtor corporation's estate:

> It is clear that rights of action against officers, directors, and shareholders of a corporation arising from a breach of fiduciary duty, which can be prosecuted by the corporation directly or shareholders derivatively before bankruptcy, become property of the estate."[165]

[158] *In re Teknek, LLC*, 563 F.3d at 646.

[159] *Id.*

[160] *ANR Ltd. Inc. v. Chattin*, 89 B.R. 898, 905–06 (D. Utah 1988).

[161] *See* Case No. 24-20138, ECF Nos. 150 (Motion for Derivative Standing) and 258 (Order).

[162] *Newsome v. Gallacher*, 722 F.3d 1257, 1267 (10th Cir. 2013) (quoting *In re Scott Acquisition Corp.*, 344 B.R. 283, 290–91 (Bankr. D. Del. 2006) (quoting *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 377 F.Supp.2d 390, 420 (S.D.N.Y. 2005)) (emphasis in original).

[163] *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857, 860 (10th Cir. 1986).

[164] *Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 805 (Wyo. 2019) ("North Star's managers did not owe fiduciary duties to the LLC's creditors.").

[165] *ANR Ltd. Inc. v. Chattin*, 89 B.R. at 901 (citations omitted). *See also, Dorr, Keller, Bentley & Pecha v. Dorr, Bentley & Pecha*, 841 P.2d 811, 816 (Wyo. 1992) ("All causes of action that could have been brought by this debtor, on behalf of the debtor, or for the benefit of the debtor, may only be brought by the trustee after the petition in bankruptcy is filed.") (quoting *Delgado Oil, Inc.*, 785 F.2d at 861).

Thus, any damages sought to compensate the corporations for the actions of their officers belong to the corporations, and thus the bankruptcy estates, and an individual creditor cannot seek individual recourse.

Insofar as Dr. McCall claims Debtors made unauthorized postpetition transfers, those claims also belong to the estate.[166] "This makes sense because, just as prepetition claims are property of the estate under § 541(a)(1), postpetition claims are property of the Chapter 11 estate under § 541(a)(7)."[167]

To the extent Dr. McCall represents to the Texas District Court that administration of Debtors' estates to date has been wrongful, he does so in direct contravention of orders this court has already issued. Suggestions made in his pleadings in the Texas District Court that aspects of estate administration have been improper borders on unethical,[168] as the court has expressly approved many of the transactions about which Dr. McCall complains.

Dr. McCall has dismissed (without prejudice) Mr. Hunsicker as a named defendant from the Texas Litigation. However, the First Amended Complaint nonetheless references Mr. Hunsicker as "a participant and a control person in the RICO enterprise" and claims he directed fraudulent acts towards Dr. McCall.[169] Additional allegations include, but are not limited to, that Mr. Hunsicker: is assisting in a scheme to liquidate Debtors' inventory; is blocking Dr. McCall's entitlement to adequate protection payments; is blocking Dr. McCall from prosecuting fraudulent transfer claims; and is taking fees contrary to Dr. McCall's alleged cash collateral interest. Dr. McCall claims Debtors' settlement offers delivered via Mr. Hunsicker were "bribery and extortion," and since they were transmitted by email, they constitute wire fraud.[170] Again, as discussed in detail above, the *Barton* doctrine applies to claims against debtor counsel.

The problem is the allegations in the Texas Litigation that form the bases of the Civil Claims, as presented to the Texas District Court, cannot simply be separated by defendant; the facts

---

[166] 11 U.S.C. § 549.

[167] *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 512 (Bankr. S.D. Ohio 2021) (citing *Maloof v. BT Commercial Corp.*, No. 1:07 CV 1902, 2008 WL 650325, at *4 (N.D. Ohio Mar. 5, 2008) ("Plaintiff's reliance on § 541(a)(1) to argue that only claims that existed at the commencement of the bankruptcy case are property of the estate is not well-taken. Section 541(a)(7) expressly includes any interest acquired after the commencement of the bankruptcy case."); *In re Robotic Vision Sys., Inc.*, 343 B.R. 393, 398 (Bankr. D.N.H. 2006) (relying on § 541(a)(7) in holding that "[c]laims of malpractice and fraud that arise during the performance of services for a debtor or a debtor in possession in a chapter 11 proceeding are property of the bankruptcy estate"); *In re Betty Owens Sch., Inc.*, No. 96 CIV. 3576 (PKL), 1997 WL 188127, at *2 (S.D.N.Y. Apr. 17, 1997) (holding a cause of action that arose postpetition in a Chapter 11 case "would have become part of the bankruptcy estate pursuant to § 541(a)(7)").

[168] *See*, counsel's duty of Candor Toward the Tribunal, Wyoming Rules of Professional Conduct, Rule 3.3(a)(1); Texas Rules of Professional Conduct, Rule 3.03(a)(1).

[169] Ex. 4, p. 9.

[170] Ex. 4.

and issues are too intertwined with issues that either have been decided by this court or are to be decided by this court in its exercise of core jurisdiction. Dr. McCall has combined claims for personal injury with claims for injury common to all creditors of Debtors' estates—making unwinding the case impossible even with Dr. McCall's concessions.

**Preliminary Injunction**

Under Section 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

> It is hornbook law that "[a]ctions and conduct excepted from the automatic stay may be subject to specific injunctive relief under § 105(a)." Collier observes that "[s]ection 105(a) has been widely utilized in attempts to enjoin court proceedings against nondebtor parties that allegedly will have an impact on the debtor's bankruptcy case," and comments that such attempts require "case by case decisions as to whether any particular action excepted from the automatic stay will result in sufficient harm or interference with the bankruptcy case to warrant the issuance of a specific injunction."[171]

"The Bankruptcy Code is designed to achieve either a reorganization or a fresh start, and § 105 injunctions may be issued only as 'necessary or appropriate to carry out the provisions of this title.' It makes sense to adopt a preliminary injunction standard with these principles in mind."[172]

In determining whether to issue a preliminary injunction to enjoin litigation pending in a different forum, the court considers the following factors: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.[173]

However, "[i]n adapting the preliminary injunction standard to the bankruptcy context, some courts reformulate, relax or even eliminate some of the traditional elements."[174] "[A] bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it. In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm."[175] A "substantial threat" to a

---

[171] *In re W. Real Est. Fund, Inc.*, 922 F.2d 592, 599 (10th Cir. 1990), *modified sub nom. Abel v. West*, 932 F.2d 898 (10th Cir. 1991) (quoting 2 Collier on Bankruptcy par. 105.02 at 105–6 (15th ed. 1990), and 105-7 to -9).

[172] *Buke, LLC v. Eastburg (In re Eastburg)*, 440 B.R. 864, 872–73 (Bankr. D.N.M. 2010).

[173] *Wilderness Workshop v. U.S. Bureau of Land Management,* 531 F.3d 1220, 1224 (10th Cir. 2008)

[174] *In re Eastburg*, 440 B.R. at 872 (citing *In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 860 (6th Cir.1992) (likelihood of success prong for granting a preliminary injunction was relaxed to achieve a basic purpose of 11 U.S.C. § 105(a), which the reorganization of a debtor's business); and *LTV Steel Co., Inc. v. Board of Education (In re Chateaugay Corp.),* 93 B.R. 26, 29 (S.D.N.Y. 1988) (stating that "[t]he usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a).") (further citations omitted).

[175] *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (quoting *In re L & S Industries, Inc.*, 989 F.2d 929, 932 (7th Cir. 1993) (internal quotation marks omitted)).

bankruptcy court's jurisdiction may warrant issuing preliminary injunctions pursuant to Section 105(a), so "they need not comply with traditional requirements of Rule 65."[176]

When the relief sought in another court potentially allows that court to effectively control aspects of a debtor's reorganization case, it "goes against the very purpose of the Automatic Stay, which is intended (among other things) 'to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.' "[177]

The *Barton* doctrine also impacts the injunction standards:

> The essence of the *Barton* doctrine is that parties may not commence or maintain unauthorized litigation. The only appropriate remedy, therefore, is to order cessation of the improper action. There is no requirement in *Barton* or any of its progeny that the aggrieved party bear the additional burden of showing irreparable harm, nor does such a requirement make any sense in the *Barton* context.[178]

### 1. *Substantial Likelihood of Success*

The court finds Debtors have a substantial likelihood of success on their claims in this proceeding. While the Texas Litigation has the potential for indemnification and vicarious liability[179] claims along with threats to divert Debtors from reorganization,[180] it is the overlap with the bankruptcy cases that creates "unusual circumstances" in this case. Extension of the automatic stay may be warranted "when the claims against [non-debtors] and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding."[181] As detailed above, there is substantial and inextricable overlap with these bankruptcy cases.

---

[176] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014) (citing cases).

[177] *In re Gen. Growth Props., Inc.*, 426 B.R. 71, 75 (Bankr. S.D.N.Y. 2010) (quoting *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (alterations in original), quoting *In re United States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999)).

[178] *In re Crown Vantage, Inc.*, 421 F.3d 963, 975–76 (9th Cir. 2005).

[179] *See USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 328 (S.D.N.Y. 2003) (explaining cases addressing vicarious liability in RICO claims); *Dolin v. Contemp. Fin. Sols., Inc.*, 622 F. Supp. 2d 1077, 1086 (D. Colo. 2009) ("[T] he authority interpreting RICO does not bar vicarious liability under that Act."). *But see Curtis v. Firstar Fin. Corp.*, No. 24-CV-243-JFH-GLJ, 2025 WL 2755846, at *3 (E.D. Okla. Sept. 29, 2025) ([T]he majority view of the Tenth Circuit's district courts is that an organization cannot be vicariously liable for its agents, employees, or subsidiaries' RICO violations solely because of the organization's relationship with the actual participants.").

[180] *In re Philadelphia Newspapers LLC*, 410 B.R. 404, 415 (Bankr. E.D. Pa. 2009), *aff'd sub nom. In re Philadelphia Newspapers, LLC*, 423 B.R. 98 (E.D. Pa. 2010) ("Many courts, analyzing the same potential harm, have enjoined non-debtors from participating in litigation so that debtors could focus on reorganization rather than have their key employees be distracted by extraneous litigation.") (collecting cases).

[181] *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*, No. 22 CIV. 4094 (KPF), 2023 WL 3506142, at *2 (S.D.N.Y. Apr. 18, 2023) (quoting *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008).

Not only do the Civil Claims interfere with this court's jurisdiction, but they are also an attempt to collaterally attack this court's orders or get ahead of issues pending before this court.

> Collateral estoppel prevents [claimant] from now pressing its mail and wire fraud claims. Although the actual claims in the RICO case are not identical to those made in the ERISA Collection Action, underlying each of [claimant's] allegations of mail and wire fraud is the contention that the Defendants intentionally or recklessly defrauded it because [claimant] did not owe benefit contributions when the letters were sent. Thus, [claimant] seeks to relitigate a factual issue decided by this Court—which it cannot do.[182]

The nature of the RICO claims favor applying collateral estoppel, when the predicate acts alleged are the same acts that were presented to and necessarily decided by this court.[183] Contrary to Dr. McCall's assertions, he cannot repackage facts and issues before this court into a RICO case and view it though a different "lens" in an attempt to relitigate those same facts and issues,[184] and ask a jury to reconsider matters this court has already decided to his detriment.

Dr. McCall may be able to show acts, cognizable under one or more of the theories raised in his First Amended Complaint, that impose a separate and distinct injury to him. The court does not make any suggestion about the merits of his claims; it may be possible, for example, for Dr. McCall to show separate and distinct injuries on his Civil Claims. However, within the Civil Claims are claims clearly belonging to the estate, one of which Dr. McCall is already pursuing in this court under derivative standing. Others this court has jurisdiction to decide, as they involve estate fiduciaries. While Dr. McCall has taken steps to alleviate this by dismissing Mr. Hunsicker and admitting withdrawing his opposition to Debtors' Motion as to Mr. Myers, the claims as currently pled are so intertwined with claims supporting the alleged individual harm, there is no way to allow part to proceed and part not to proceed as pled. These claims are a result of the same acts, performed by the same individuals, as part of the same alleged conspiracy.

As explained at length above, "unusual circumstances" exist that warrant extending the automatic stay and enjoining the prosecution of the Civil Claims, namely, the inextricable overlap

---

[182] *Andrea Doreen Ltd. v. Bldg. Material Loc. Union 282*, 299 F. Supp. 2d 129, 146 (E.D.N.Y. 2004). *See also, Tia v. Honolulu Police Dep't*, No. CV 17-00607 DKW-KJM, 2018 WL 762338, at *5 (D. Haw. Feb. 7, 2018) (explaining allegations in a RICO claim that were the subject of prior judicial proceedings may be barred by issue preclusion doctrines).

[183] *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir. 1985); *see also In re Bennett Funding Grp., Inc.*, 367 B.R. 302, 325 (Bankr. N.D.N.Y. 2007) (dismissing counterclaims finding *res judicata* applied when the court had already addressed the trustee's conduct which was the subject of the counterclaims); *Denny v. Ford Motor Co.*, 959 F. Supp. 2d 262, 271 (N.D.N.Y. 2013) ("Plaintiffs' claims of fraud, fraudulent non-disclosure, civil conspiracy, and violations of RICO would necessitate an extensive relitigation of the issues decided . . . and are accordingly barred under the doctrine of collateral estoppel.").

[184] *In re Bennett Funding Grp., Inc.*, 367 B.R. 302, 324 (Bankr. N.D.N.Y. 2007) (preventing party from arguing the Trustee submitted materially false and misleading information as a collateral attack on the court's order confirming the plan.)

with Debtors' bankruptcy cases and pending adversary proceedings within the cases, the direct
interference with this court's exercise of core jurisdiction, the specter of collateral estoppel, and the
distinct likelihood of "record taint."

2.    *Immediate and Irreparable Harm*

As Mr. Myers credibly testified, the impact of the Civil Claims on Debtors' business is real.
The harm is the stigma of the claims themselves and its impact upon the brand. Much of the BOTW
entities' inventory consists of components in a heavily regulated industry; all serialized items
manufactured by the company must bear the "BOTW" brand. The stigma associated with RICO
allegations and a "criminal enterprise" denigrate that brand and devalue the inventory, which in turn
causes harm to all creditors as well. " 'A civil RICO suit is in effect quasi-criminal in nature.' The
mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect on those
named as defendants."[185] Dr. McCall ensures his First Amended Complaint in the Texas Litigation
alleges criminal activity, claiming the defendants "have also given a bad name to Gun Rights and
the Second Amendment while increasing the danger to the public that firearms will fall into the
hands of violent criminals or gang members."[186] He alleges an organized crime enterprise, claiming
Mr. Edwards operates "behind the scenes and 'pulls the strings' like a crime boss"[187] while Mr.
Myers "is Mr. Edwards' lieutenant in the RICO Enterprise." [188] Dr. McCall names employees,
vendors, and law firms as part of the RICO enterprise.[189]

The purpose of these claims can only be to incite fear in those interacting with both the
defendants and the alleged enterprise, including Debtors. It takes no stretch of the imagination to
understand the readily recognizable stigma that comes with RICO claims and how such stigma will
negatively impact Debtors' ability to operate, which in turn affects their ability to reorganize.[190]
"[T]he irreparable harm requirement may be satisfied if 'the action to be enjoined is one that
threatens the reorganization process or which would impair the court's jurisdiction with respect to a
case before it.' "[191]

---

[185] *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990) (quoting *Page v. Moseley, Hallgarten, Estabrook &
Weeden, Inc.*, 806 F.2d 291, 298 (1st Cir. 1986)). *See also, Star Waste Servs., LLC v. U.S. Waste, LLC*, No. 1:07-
CV-127, 2008 WL 11342577, at *4 (E.D. Tenn. June 11, 2008) (recognizing the harm a legitimate
enterprise will incur by the stigma associated with RICO litigation).
[186] Ex. 4, p. 2.
[187] *Id.*, p. 4.
[188] *Id.*
[189] *Id.* at 2.
[190] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 (1985) ("As for stigma, a civil RICO proceeding leaves no
greater stain than do a number of other civil proceedings.").
[191] *In re Sears Holding Corp.*, 659 B.R. 236, 251 (Bankr. S.D.N.Y. 2024) (quoting *Nev. Power Co. v. Calpine Corp.
(In Re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007) (citing *In*

Courts also counsel against piecemeal litigation, finding irreparable harm when there is concern "with wasting time and resources in an arbitration with awards that might eventually be, at best, inconsistent with this Court's ruling, and at worst, essentially ineffective."[192] Allowing creditors to "artfully plead their way out of bankruptcy court would unravel the bankruptcy process and undermine an ordered distribution of the bankruptcy estate."[193] This principle applies here, as Dr. McCall seeks redress for himself in another court on claims belonging to all creditors, and claims that could deplete assets for him to recover for the benefit of the estate in his derivative role before this court.

In a bankruptcy setting, irreparable harm occurs if the action sought to be enjoined would consume a debtor's time, energy and resources and substantially hinder the debtor's reorganization effort.[194] " Dr. McCall recognized this injury and withdrew his objection as to Debtors' COO, Chase Myers:

> The Notice withdraws Dr. McCall's and Stealth Vision's opposition to the Debtors' request for a preliminary injunction to the extent the Debtors' request for injunctive relief relates to the Debtors' Chief Operating Officer, Charles Myers.

> At the hearing this week on Monday, October 27, 2025, the Debtors' COO testified that the Texas RICO Litigation could have an impact on his ability to manage the Debtors' bankruptcy cases and perform his duties as COO.

> Dr. McCall and Stealth Vision believe that by filing this Notice, the Debtors' concerns about the potential impact of the Texas RICO Litigation on the ability of Mr. Myers to perform his duties as COO for the Debtors' has been alleviated.[195]

In addition, as aforementioned, the risk of "record taint" is greatest when the claims against the debtor and the nondebtor Defendants implicate the same transactions, the same time periods, and the same alleged harms. Thus, the possibility exists the evidentiary record developed in the Texas Litigation could prejudice Debtors, especially considering Debtors' absence from that litigation. The risk that the Texas Litigation against could result in adverse consequences for Debtors—such as record taint—weighs in favor of issuing a preliminary injunction.

    3.  *Balancing of Harms*

In balancing the harms, the considerations particularly relevant here are interference with

---

re Alert Holdings, Inc., 148 B.R. 194, 199 (Bankr. S.D.N.Y. 1992)); *In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009).

[192] *In re Sears Holding Corp.*, 659 B.R. 236, 252–53 (Bankr. S.D.N.Y. 2024) (quoting *Gov't. Emp. Ins. Co. v. Binns*, 2022 WL 4539361, at *6 (E.D.N.Y. Sep. 28, 2022)).

[193] *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 442 (4th Cir. 1999).

[194] *In re Archambault*, 174 B.R. 923, 930 (Bankr. W.D. Mich. 1994).

[195] Adv. 25-2020, ECF No. 30.

Debtors' reorganization, judicial economy, litigation costs to the parties, and avoiding inconsistent results in two forums as discussed above.

The only injury Dr. McCall claims is a deprivation of his "constitutional right" to access courts for redress of his grievances. This argument is not well taken. As explained above, Dr. McCall is prosecuting the fraudulent transfer claim in this court and has complained of the various payments made in the bankruptcy cases, which have been, or will be heard by this court. The claims that give rise to individual injury to Dr. McCall are also the subject of the Trademark Infringement Litigation.

The court finds the balancing of harms weighs in Debtors' favor. The court finds the piecemeal litigation causes harm to Debtors' other creditors. It has the potential to result in inconsistent results when Dr. McCall has sought to revisit matters addressed in prior decisions of this court and of the District Court on appeal. By contrast, the only harm to Dr. McCall will be a delay to litigate issues in the forum of his choice – although the vast majority of the issues are in fact being litigated.

### 4. *Public Interest*

Public policy favors judicial economy and minimizing expense for the parties to the litigation.[196] "[P]romoting a successful reorganization is one of the most important public interests."[197]

"Creditor equality has been described as one of the most important purposes of bankruptcy."[198] Without the automatic stay and exclusive standing given to the trustee or debtor-in-possession to pursue third-party claims, creditors, if free to pursue claims against third parties for a common injury arising from a fraudulent scheme, would " 'convert the bankruptcy proceedings into a race to the courthouse,' and effectively 'derail the bankruptcy proceedings.' "[199]

Of equal consideration, is the waste of judicial time and resources—asking another court to decide an issue before this court—without informing the other court of this court's previous decisions or the pending issues.[200] The most efficient use of judicial resources and the most economical way to resolve the pending litigation between the parties is to allow this court to exercise its core jurisdiction, which will likely resolve the vast majority of the claims.

---

[196] *In re Eastburg*, 440 B.R. 864, 878 (Bankr. D.N.M. 2010).

[197] *In re Gander Partners LLC*, 432 B.R. 781, 789 (Bankr. N.D. Ill. 2010), *aff'd sub nom. Harris N.A. v. Gander Partners LLC*, 442 B.R. 883 (N.D. Ill. 2011), *vacated* (Feb. 9, 2011) (quoting *In re Integrated Health Services, Inc.*, 281 B.R. 231, 239 (Bankr. D. Del. 2002).

[198] *In re Barkany*, 542 B.R. 662, 691 (Bankr. E.D.N.Y. 2015).

[199] *In re Barkany*, 542 B.R. at 691 (citing *Stahl*, 443 B.R. at 311–312) (quoting *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th Cir. 1998))).

[200] *See In re Bennett Funding Grp., Inc.*, 367 B.R. 302, 325 (Bankr. N.D.N.Y. 2007) (explaining breach of fiduciary duty allegations could not stand when those actions had been litigated and authorized by the bankruptcy court.).

**Conclusion**

The Tenth Circuit recognizes a temporary stay to prohibit a creditor's suit against a nondebtor "during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a). . . ."[201] The court finds it is appropriate to stay the proceedings pending the outcome of this adversary proceeding.

IT IS THEREFORE ORDERED based upon the court's findings and also based upon 11 U.S.C. §§ 105(a) and 362(a), Debtors' Motion for a Preliminary Injunction is GRANTED.

IT IS FURTHER ORDERED the above-captioned Defendants, and their respective attorneys, officers, agents, servants, employees, and any all persons in active concert or participation with them, are hereby enjoined and shall cease and desist all activities to pursue and advance the claims and causes of action asserted in the civil action pending before the United States District Court for the Eastern District of Texas, case number 25-cv-00091 MJT (Texas Litigation), and shall cease prosecution of the Texas Litigation pending the outcome of the trial on the merits in this proceeding.

BY THE COURT

11/13/2025

Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

---

[201] *In re W. Real Est. Fund, Inc.*, 922 F.2d 592, 601–02 (10th Cir. 1990), *modified sub nom. Abel v. West*, 932 F.2d 898 (10th Cir. 1991) (referencing *In re American Hardwoods, Inc.*, 885 F.2d at 621).